139 So.2d 242 (1962)
STATE of Louisiana, through the DEPARTMENT OF HIGHWAYS, Appellant,
v.
Almeda BARRILLEAUX et al., Appellees.
No. 5505.
Court of Appeal of Louisiana, First Circuit.
March 14, 1962.
D. Ross Banister and Jesse Moore, Jr., Baton Rouge, for appellant.
Robert D. Morvant, Thibodaux, for appellees.
Before ELLIS, HERGET and MILLER, JJ.
HERGET, Judge.
On June 20, 1958 the State of Louisiana, through the Department of Highways instituted this action seeking the expropriation of three tracts or certain parcels of land in the Parish of Lafourche consisting of portions of Lots 6 and 7 of Block 17; portions of Lots 6 and 7 of Block 18 and portions of Lots 6 and 7 of Block 19, of the Barrilleaux Addition to the Town of Lockport, Louisiana, owned by the defendants Almeda Barrilleaux and Norine Barrilleaux Rome.
The order of expropriation was dated and signed June 20, 1958, the Department of Highways having deposited in the Registry of the Court the sum of $3,952 as just compensation for the property taken. Prior to the trial of the suit on the merits, the Department of Highways amended its original petition on May 20, 1961, wherein its estimate of just compensation was amended by reducing the sum to the amount of $2,952. Following the trial of the case the Lower Court, on February 23, 1961, fixed a value of the property taken at $8,820; from which judgment the State of Louisiana, through the Department of Highways prosecutes this appeal.
Counsel for Defendants filed an answer to the appeal seeking an affirmance of the judgment.
The sole issue presented for our review is a resolution of the value of the land taken.
Learned counsel for the Department of Highways maintain in this Court that the Trial Court erred in predicating a determination of market value on a condition *243 and situation of the property taken that did not exist at the time of the expropriation and that the Court further erred in rendering an excessive judgment of market value not founded on any evidence introduced on the trial of the case.
The land expropriated herein is a portion of property owned by the Defendants located in Lockport, Lafourche Parish, Louisiana, near the center of the town and according to the survey contains twenty-nine blocks of ground, each block being divided into twelve lots and is known as the "Barrilleaux Subdivision". The Department of Highways has expropriated portions of Blocks 19, 18 and 17, which blocks are contiguous to Blocks 14, 15 and 16, respectively. The evidence reveals since the property was surveyed that it has been the custom of the Barrilleaux sisters to place the property on the market by opening up for sale lots in a row of three blocks before placing the remaining blocks of land on the market. At the date of this expropriation lots in Blocks 14, 15 and 16 adjoining the expropriated property had been placed on the market for sale and many of said lots had been disposed of. The sales of lots in Blocks 14, 15 and 16 were considered by the Plaintiff, the Defendants and the Lower Court to be excellent comparables in estimating the value of the land expropriated. The value of the comparable lots was shown to have been $1,800 per lot. The basis for the differences in view as to the value of the property expropriated lies in the contention of Appellant that the land expropriated being only pasture land, not having been subdivided and provided with sewerage facilities, streets and electricity is not comparable in value to that of the land of Defendants which has previously been subdivided and developed and that the value of raw land in the condition of the Defendants' property expropriated is one-third the value of their developed property since a subdivider would be required to expend two-thirds the value to develop the property and place it on the market so as to obtain the $1,800 comparable value, it being their contention the market value of the land expropriated in the instant case is what a prospective purchaser for subdivision purposes would have been willing to pay for the property relying on the cases of State v. Hedwig, Inc., La.App., 133 So.2d 180; Parish of Iberia v. Cook, 238 La. 697, 116 So.2d 491.
The views expressed in the cited cases are inapposite to the factual situation in the instant case for the reason the evidence affirmatively shows that the Barrilleaux sisters with the location of their property in the center of the Town of Lockport were in a position to place additional blocks of the subdivision on the market by the minimal expenditure of the cost of culverts installed. Thus, the value of the lots in that portion of the subdivision unopened was comparable to the value of the lots in the subdivision already marketed. Under such factual showing the value of the land expropriated is not to be categorized as raw pasture undeveloped land having a value for subdivision purposes only, but the market value must be computed upon the value of the land, less the cost of development to the Barrilleaux sisters which cost is affirmatively shown to be nil.
Honorable J. Louis Watkins, the trial judge concluded the property expropriated had a comparable value to that of the comparables used, assigning therefor written reasons in which we are in complete accord and which we adopt in part as our own, as follows:
"The chief witness for the State was J. Louis Blouin, a resident of Houma in Terrebonne Parish, who testified to his attendance at a number of seminars at qualified institutions teaching the art of appraisal, to membership in a number of professional societies and to a broad background of experience of 15 years as a realtor, all of which demonstrate that he is thoroughly trained in the theory and technique of appraisal and eminently qualified as an expert. However, it is noted that his only experience in the area of the subject *244 property has been this one appraisal made in this case.
"The witness explained (Tr. 7) that `I confined my estimate to value wholly on the market data approach', which `means that you estimate the most recent sales available of the most comparable properties to the property under appraisal to find the price at which these particular properties sold', * * * `then relate that to the subject property and estimate the market for the particular property under appraisement as to the date you make it'. He stated (Tr. 7) that `other recognized and accepted approaches such as income and replacement were just not applicable in this particular instance'.
"For the purpose of orientation and to facilitate a better understanding of the relationship of the comparables to the property expropriated, we make the following general observation: The six lots expropriated comprise the six southernmost lots of Blocks No. 17, 18 and 19 of the Barrilleaux Addition, which blocks are bounded on the north by Sixth Street, which is the street separating Blocks No. 17, 18 and 19 from Blocks No. 14, 15 and 16, where most of the comparables are located.
"This expropriation took place on June 20, 1958. The witness then proceeded to refer to the sales of a number of comparables as follows:
"(1) On January 18, 1956 Lots 5 and 6 in Block 14 sold for a price of $3,300.00. It is noted that the witness assumed the value of each lot to be $1,650. The witness noted that one of the lots was a corner lot but that in his view there was no difference in value between a corner lot and an inside lot in a residential area. It is worthy of special note that this same witness testified as an expert in behalf of the State in this Division of the 17th Judicial District Court, in the Parish of Terrebonne, in the suit of the Department of Highways vs. Bundy, No. 18,309 on the Civil Docket, on November 10, 1958, and that (Tr. 122) he appraised the value of two adjoining lots forming a home site and fixed an extra value on the corner lot `for what would be called the corner influence'. And in that same suit, another expert for the State, Mr. E. Holland Johnson, in appraising that same property, testified (Tr. 85) that the `corner lot has an edge over the inside lot'. This additional value of a corner lot over an inside lot also appears to have been recognized by the experts in State vs. McDuffie, [240 La. 378,] 123 So.2d 93. Thus, it appears that the experts, including this witness, recognize a corner lot as having a greater value than an inside lot. In that connection, it will be hereinafter shown in the testimony of Mr. Jeffrey LeBlanc that in all of the sales in this subdivision, corner lots brought higher prices than inside lots. Incidentally, it is our view that, whatever may be the opinion of the experts as to the values of corner lots as compared to inside lots generally, and whatever may be the rule elsewhere, the purchasers of lots in the Town of Lockport in this very same subdivision in an adjoining block, considered corner lots to be more valuable than inside lots; and it is our concern and duty to determine what the values of the lots in this subdivision in this community actually were, and not what their theoretical value might be somewhere else. While all lots might theoretically have the same value in Timbuktu, that happens not to be the situation in Lockport, where corner lots have a greater value than inside lots as shown by the comparables referred to by the experts.
"(2) On January 23, 1956 Lots 1, 2, 11 and 12 in Block No. 16 were sold for an average price of $1,225 each or 20.4¢ per square foot.
"It is subsequently explained in the testimony of Jeffrey LeBlanc that there had been a difference in the sale price of lots in Block 16 (Tr. 66), which sold for about $1,200 while those in Block 14 sold for a minimum of $1,500, for the reason that there was a large drainage ditch running through the center of Block 16, which was not the case with other blocks, and as to *245 it `purchasers were given an option of paying the same price as the other lots and letting the Barrilleauxs elevate it to the elevation of the adjoining lots or to buy it at a cheaper price and handle their own filling'.
"At this point we direct attention to the testimony of Mr. LeBlanc (infra) as to the elevation of the property involved in this proceeding.
"(3) On January 2, 1957 Lots 8 and 9 of Block 16 (inside lots) were sold for $1,000 each, and on March 16, 1957 Lot 4 of Block 16 (a corner lot) for $1,200. See comment in the preceding paragraph showing reason for the lower value of lots in Block 16.
"(4) On January 4, 1958 Lot 18 of Block 14 was sold for $1,800 or 30¢ per square foot (Note: Although that is the lot number shown in the transcript, it is an apparent error, since there are only 12 lots in Block No. 14).
"(5) On January 10, 1958 Lots 1, 2, 3 and 4 in Block 14 were sold for a recited price of $3,334.80 or an average price of $833.70. It is specially noted that the purchaser of these lots, Mr. Eugene Gouaux, testified (Tr. 59) that the actual purchase price for these lots was $1,500 for each of the three inside lots and $1,800 for the corner lot; and that the price recited in the deed, as shown by Mr. Blouin's testimony, was one stipulated by agreement by the parties for their convenience and did not actually reflect the true purchase price mentioned above.
"(6) On February 7, 1955 the entire Block 15, 12 lots, were sold for an average price of $1,458.33 per lot; and the same property on September 22, 1956 for the average price of $1,583.33 per lot.
"(7) On January 4, 1958, Lot 7 of Block 14, a corner lot, was sold for $1,800 (Tr. 19).
"The basis of this witness' appraisal is that, since this property is separated from the remainder of the subdivision by a barbed wire fence, it was in `a raw land state even though there was a subdivision plat of record'; and that in such condition its market value was 10¢ per square foot. His opinion was that a `prudent investor would not pay more than one-third * * * of the expected gross return for raw land to be developed into a residential subdivision'. He stated that if such land were developed into a subdivision, the investor `should expect a minimum of 30¢ return after he made expenses of developing the streets and putting in the necessary utilities, the time and effort devoted, and risk involved and so forth'. He stated that he did not think that `any prudent investor would even give a second thought to property for development purposes if he had to pay more than that (10¢ per square foot) for it in its raw state'. He testified that he considered the property undeveloped even though it was only one block away from a developed area, because of the existence of a barbed wire fence. It is clear that the appraisal of the witness was a value of 30¢ per square foot, less the cost of development, or a net value of 10¢ per square foot. This theoretical appraisal on May 27, 1960 of a total value of $2,952.00 for the property expropriated is at variance with the appraisal made by the same experts on May 20, 1958 of $3,952.00.
"Mr. Eugene Y. Charron, Head Right of Way Agent for District 3 in the Highway Department, with about 14 years of experience in dealing with land values and with the benefit of instruction in real estate appraisal, orally made a joint appraisal with Mr. Blouin and concurred with him in his findings.
"The chief witness for the land owners was Mr. Jeffrey LeBlanc, who is 40 years old and a life long resident of Lockport and who, as an attorney and notary since 1948, has had considerable experience in making inventories and appraisals of property in and around the Town of Lockport. He was City Attorney for 4 years and *246 Mayor of Lockport for 8 years, during which period 3 or 4 bond issues of the municipality were handled, which made it `necessary to become familiar with the value of property'.
"The witness was particularly familiar with the Barrilleaux subdivision, because he has handled most of the sales for the Barrilleauxs since 1948. The witness impressed us as having a rather comprehensive knowledge of values generally in his community, and a particular knowledge of the subject property in this case and of all of the comparables.
"In addition to the comparables referred to by Mr. Blouin, Mr. LeBlanc also referred to the sale of Lots 11 and 12 in Block 14 on March 15, 1955 for $3,300, $1,800 for the corner lot and $1,500 for the inside lot.
"The witness testified that (Tr. 61) `the Barrilleaux subdivision is the very central part of the town', and that (Tr. 65) `the Barrilleaux lots are probably the most desirable because of its proximity to water lines, gas lines, sewer systems, business district, churches and schools and so on'.
"In view of the testimony of the State's witnesses as to the cost of development, it must be specially noted that in the case of this subdivision the only cost borne by the owners was for culverts, which were purchased `through the town for the Barrilleauxs' and `were charged to the Barrilleauxs' (Tr. 70). The testimony is (Tr. 67) that in this subdivision the fence has been moved back a block at a time as the owners were ready to market their lots on a limited scale, and (Tr. 71) that the water was put in by the town, the gas by the gas company and the electric lines by the power company, all without cost to the owners. Thus, it appears that the theory of the State's witness has no application in fact in this case, and that the only cost the land owner has had has been for culverts.
"Mr. LeBlanc also testified that (Tr. 66) in the 1930's Bayou Lafourche was dredged, the Barrilleaux property was one of the areas used for the deposit of spoil and `it so happens that the area on both sides of the highwayBlocks seventeen, Eighteen, Nineteen, according to your map, Twenty, Twenty-one and Twenty-two are probably among the most desirable. They are considerably higher even than the front portion of it is'.
"Another circumstance that impresses us that the State's experts are in error in fixing a theoretical value of 10¢ per square foot, is that in the case of Block 19, the testimony shows that the street is surfaced, that sewerage, electricity and water, all of the utilities, are available and there were residences on Vacherie Street opposite Block 19 in June, 1958. It is our view that if the lots on one side of Vacherie Street are worth 30¢ per square foot, it is rather absurd to conclude that the existence of three strands of barbed wire in front of the lots across the street reduce their value to 10¢ per square foot.

* * * * * *
"It is noted that all of the subject property in this proceeding consists of corner lots and it is our view that the said corner lots are each worth at least $1,800. State v. McDuffie, supra, holds that `Where recent sales of comparable property in the vicinity of the expropriation are available, such constitutes the best criteria of market value of the expropriated property.' It is our opinion that the comparables referred to in this case support and sustain the value of $1,800 per lot.
"On that basis, we find the value of the fractional portion of Lot 7 in Block 17 herein expropriated to be $1,566.00, the value of the fractional portion of Lot 6 in said block to be $1,494.00, and the value of the fractional portions of the remaining four lots to be $1,440.00 each; making a total of $8,820.00 for the property taken. * *"
Accordingly, for these reasons the judgment of the Trial Court is affirmed.
Affirmed.