SARTAIN, Judge.
This expropriation proceeding concerns the construction of a controlled-access highway known as 1-55 which parallels the present U. S. Highway 51 (Ponchatoula-Man-chaca) in the Parish of Tangipahoa, Louisiana. The State of Louisiana, through the Department of Highways, hereinafter referred to as Department, seeks title to some 39 lots abutting U. S. Highway 51 and owned by defendant, Charles S. Potter.
The Department’s original petition, filed January 22, 1959 and supplemental petition, filed July 30, 1959 described the subject property as eight different parcels with each description indicating appropriate acreage. The Department deposited the sum of $21,630.00 with the original petition. An additional sum of $40,408.00 was deposited with the supplemental petition, representing a total of $62,038.00 as just compensation owed to defendant for the quick taking of his property. The trial judge ordered, inter alia, an increase of $8,536.00.
Defendant has taken this appeal and urges that the trial judge erred as follows: (1) that the awarded compensation is inadequate, (2) that defendant was entitled to severance damages to the remaining portions of his property, (3) that defendant was entitled to recover for surveyor fees, and (4) that the amount awarded for expert witness fees is inadequate.
The Department answered the appeal and urges the correctness and affirmation of the trial judge’s decision.
Originally, defendant purchased 200 acres situated in Sections 28 and 33, Township 8 South, Range 8 East, Tangipahoa Parish, on March 14, 1955 from Mrs. Mollie B. MacLeod by warranty deed which described the property as being a portion of the north half of Section 33 and a portion of Section 28, both in Township 8 South, Range 8 East, which lie west of the Illinois Central Railroad. This sale was subject to a previous right of- way deed granted by Mrs. MacLeod on December 23, 1953 to the State of Louisiana which permitted the widening and improvement of U. S. Highway 51.
*310 Before we consider the appraisals of the various experts and their respective assignment of values, it is advisable to observe some of the facts and circumstances concerning the property which yields the expropriated portions. Mrs. Mollie B. Mac-Leod defendant’s ancestor in title, was the owner of 200 acres of land which was bounded on the east by the old U. S. Highway 51. On October 6, 1953, Mrs. MacLeod granted to the Department of Highways an additional strip of land along her entire eastern boundary. This permitted the improvement and enlargement of the roadbed for the new Highway 51. At the time of this transaction there also existed an old canal which generally ran parallel to the original highway right of way. Part of the consideration expressed in Mrs. MacLeod’s grant of additional right of way was the requirement that a new borrow canal be dug and that the fill thus extracted be used to cover the old canal and raise the elevation of the property between the newly constructed borrow canal and U. S. Highway 51. Accordingly, there was created a merchantable strip of land paralleling the new U. S. Highway 51 the entire length of Mrs. MacLeod’s 200 acres with an average width of 315 feet.
During the construction of the improved U. S. Highway 51 and on March 14, 1955, Mrs. MacLeod conveyed her 200 acres to the defendant for the consideration of $30,000.00. Very shortly after his acquisition, defendant caused the strip of land between the borrow canal and U. S. Highway 51 to be surveyed and divided into 83 lots. These lots measured 100 feet front on U. S. Highway 51 by a depth between parallel lines of 295 feet. Defendant reserved a strip of land at the rear of each lot for the common use of all future purchasers which would permit free access along the eastern bank of the borrow canal. This strip varied in widths according to the actual contour of the eastern bank of the said canal, beginning with 20 feet behind Lots 9 and 10 to only several feet behind Lots 63 and 64. The lots were numbered 1 through 83 from north to south and the property thus subdivided was called “Strader Subdivision.” Defendant frankly admits that he was attracted to the purchase of the 200 acres because of the creation of lots which would have a frontage on a new highway and with water frontage on an excellant canal to its rear. There is no doubt that his foresightedness proved correct and that he became the benefactor to a large degree of the agreement entered into between Mrs. MacLeod and the Department of Highways, requiring the filling of the old canal and the creation of the new borrow canal.
Shortly after the completion of improvements to U. S. Highway 51, it became known the the proposed Interstate-55 would be constructed parallel to U. S. 51. In January of 1959 this suit was instituted and as stated above has for its purpose the expropriation of Strader Subdivision in its entirety, that is all of the land between the eastern bank of the new borrow pit and the western right of way boundary of U. S. Highway 51.
The main issues presented to the trial court and for consideration here on appeal concern the determination of just compensation for the defendant for the taking of 39 lots which remained in his ownership plus defendant’s claim for severance damages.
In support of their respective contentions as to the market value of the lands expropriated, the Department used Mr. Max J. Derbes, Jr. and Mr. Polk Hebert and defendant relied upon Mr. Omer Kuebel, Mr. Robert G. Farris and Mr. Henry B. Breeding. The trial court considered the testimony of each of these expert witnesses and relied principally upon the testimony of Mr. Derbes for the Department and Mr. Kuebel for the defendant. Mr. Derbes on direct examination valued the 39 lots of defendant at SSS.óSO.OO.[1] Under cross examination he revised his appraisal upwards to the sum of $66,400.[2] Mr. Kuebel appraised the same 39 lots for $87,300.[3] *311 Mr. Breeding’s valuation was $87,750.[4] The trial judge determined that the value of defendant’s 39 lots was $70,000.[5] Each of the aforementioned witnesses and the trial judge considered the lots grouped according to numbers, front footage, and value per front foot as detailed in the footnotes 1 — 5 below.
It was agreed by all that the highest and best use of the expropriated properties was for home sites, camp and recreational facilities.
Each expert used the market data, i.e., comparable sales, approach, which is recognized as the most reliable and desired method of appraisal.
A review of the values assigned by the witnesses herein shows that Mr. Derbes under direct examination appraised defendant’s properties at $15.04 a front foot. On cross examination he admitted that his appraisal was on a parcel or acreage basis and not on individual lots. He conceded that if his appraisal had been on individual lots his evaluation would have been $17.03 a front foot. Mr. Kuebel, one of defendant’s experts appraised the property at $22.-38 per front foot and Mr. Breeding, defendant’s other expert, appraised the property at $22.50 per front foot. The trial judge awarded defendant $17,95 per front foot. The court’s determination on a front foot basis is 92 cents per front foot greater than Mr. Derbes’ evaluation on cross examination and $4.43 less than Mr. Kuebel’s evaluation. Thus it is clear that the trial judge’s declaration of value adhered closer to that of Mr. Derbes than that of Mr. Kuebel.
It is axiomatic that in the trial of a case such as this much discretion is granted to the trier of fact in the evaluation of and the weight to be given to the testimony of each of the expert witnesses and that his findings of fact will not be disturbed on appeal unless such findings are clearly in error.
It is equally well established that as to expert witnesses the testimony of each is to be accorded equal weight when such appears to be grounded on well established facts and is supported by sound reasoning and good judgment.
The trial judge, in his written reasons for judgment, discussed at length the merits and demerits of certain aspects of the testimony of the experts. He apparently considered that the testimony of Mr. Derbes was entitled to greater weight than Mr. Kuebel’s because the judgment rendered by him is more- in line with the opinions expressed by Mr. Derbes. We have very carefully examined the testimony of these two witnesses and are forced to conclude that the trial judge committed error in *312 failing to accord to the testimony of Mr. Kuebel greater weight than he did to Mr. Derbes. The record clearly convinces us that Mr. Kuebel’s opinion is grounded upon better facts and is sounder in reasoning arid accordingly evidences better judgment.
Mr. Derbes was instructed by Department to appraise defendant’s 39 remaining lots on a parcel or acreage basis. Department’s original and supplemental petition describe the subject property not by lots but in parcels with appropriate acreage assigned to each parcel. Said petitions identified the parcels as Numbers 1-8, without reference to the lots involved. For example, Parcel No. 1 comprises Lots 12-25 inclusive; Parcel No. 2 includes Lots 31-39 inclusive; Parcel No. 3 comprises Lots 49-61 inclusive; Parcel No. 6 is Lots 65-68 inclusive; and, Parcel No. 7 is in fact Lot 70 of Strader Subdivision. Parcels 4 and 5 include the strips of land behind Lots 12-25 and 46-78 respectively. Parcel No. 8 is the southeast corner of Lot 43, triangular in shape. Not only did Mr. Derbes acknowledge that his appraisal on a parcel basis amounted to a $2.40 difference on a front foot basis, he steadfastly maintained that the lots involved had a lesser market value in groups than they did individually. His testimony in this respect is as follows:
“Q. Am I correct if I say that in a nutshell your theory about appraising lots in a parcel is nothing more than saying that an owner of a subdivision in an expropriation proceeding is not entitled to the retail value of his lots?
A. That is correct but it is very difficult to put in a nutshell. The thinking of all of the writings on the subject, all of the teachers throughout the country, of which I am one, all of the publications and no where can it be found that a man who owns a series of lots in all fairness deserves the retail price of each individual lot times the number of lots.
Q. Where the subdivision was in existence and the lots were actually sold on a lot basis?
A. That is correct * *
Mr. Derbes’ adherence to the above quoted testimony is further evidenced by his appraisal of Parcel No. 7, which is the single Lot 70, in the amount of $22.00 a front foot. To adopt the theory of Mr. Derbes, under the circumstances of this case and hold that groups of lots situated in an established subdivision are subject to a diminution in market value because they are expropriated would be equating this expropriation to a forced sale and would in effect be denying the owner of the privilege of selling his lots individually. Further, the. comparables used in this case involved five sales of single lots, one sale of 2 lots, two sales of 3 lots, two sales of 4 lots, one sale of 5 lots, and one sale of 11 lots. These comparables must be construed as also reflecting any overall reduction in value occasioned by sales of lots in groups. Any additional adjustment as urged by Mr. Derbes would negate the importance of the comparables and would not be truly representative of the market value of the remaining lots. City of Shreveport v. Jones, 236 La. 727, 109 So.2d 72; State, Through Dept. of Hwys. v. Boyer, La.App., 130 So. 2d 738; State, Through Dept. of Hwys. v. Barrilleaux, La.App., 139 So.2d 242; State, Through Dept. of Hwys. v. Brooks, La.App., 152 So.2d 637; State, Through Dept. of Hwys. v. Cobb, La.App., 169 So.2d 419; Lake Charles Harbor and Terminal Dist. v. Dupin, La.App., 182 So.2d 339.
While we can envision certain situations where the market value of a group of lots would be less than the market value of an individual lot, such a situation is not presented here because the nature, status and merchantability of lots in Strader Subdivision were clearly established at the time this litigation was instituted. In a short period of two years defendant had sold forty-four of his original eighty-three lots to twelve different purchasers. Admittedly, *313 one such purchaser of five lots was his son and three lots were sold to his brother. However, it still remains that thirty-six lots were conveyed to ten other individuals by sales that clearly reflect free and arms length transactions.
Mr. Derbes stated that he could not view all of the sales in Strader Subdivision as comparables because a large number of the purchases were on terms and that he considered such purchases “speculative”. The record does not support this conclusion for the testimony is completely barren of any evidence that would question the financial ability of any of the purchasers to meet the terms prescribed in the “speculative” sales. As a matter of fact most of the sales were on terms because that is the way defendant desired to sell his lots. We believe the fact that ten purchasers saw fit to buy lots in Strader Subdivision prior to this expropriation precludes the assertion •that their interests were “speculative”.
At the risk of belaboring the point, we wish to note additional reasons why we cannot adopt Mr. Derbes’ assignment of lesser values simply because the expropriated lots are grouped together as parcel^. For example, he assigns a value of $16.00 per front foot to Lots 37-39, yet Lots 40 and 41 sold for $19.97 per front foot just one year before this expropriation. The same is true in the case of Lots 65-68 which he appraised at $18.00 per front foot, yet he acknowledged that he appraised Lot 69 at $22.00 per front foot. He further agreed that he had appraised single Lots 77 and 78 at $22.00 and Lot 79 at $25.00 per front foot. The witness does not distinguish the lots expropriated and individual lots as to topography, accessibility, desirability, etc.; his sole distinguishing criteria is that lots in groups do not have the same market value as similarly situated individual lots.
We turn now to the testimony of Mr. Kuebel and find that his overall appraisal at $22.38 per front foot is based upon the following comparables, listed by date, lot number, consideration, and price per front foot: June 21, 1956, Lot 78, $1,000.00, $10.00 per front foot; July 26, 1956, Lot 77, $1,000.-00, $10.00 per front foot; October 16, 1956, Lots 71-72, $2,952.00, $14.76 per front foot; October 26, 1956, Lots 44-48, $10,080.00, $25.00 per front foot; July 25, 1957, Lot 69, $2,200.00, $22.00 per front foot; November 21, 1957, Lots 62-64, $7,350.00, $24.50 per front foot; December 24, 1957, Lot 26, 28-30, $6,200.00, $15.50 per front foot; March 14, 1957, Lots 12-13, $2,900.00, $14.50 per front foot; January 8, 1958, Lots 40, 41, 73, $5,990.00, $19.97 per front foot; May 21, 1958, Lots 80-83, $10,000.00, $40.00 per front foot;[6] May 7, 1958, Lots 1-11, $21,-450.00, $19.50 per front foot ;6 May 7, 1958, Lot 79, $3,050.00, $30.50 per front foot;6 March 27,1958, Lots 42-45, $7,000.00, $20.00 per front foot.
This witness did not consider as fully comparable the lots sold on Jones Island. He concluded that the best comparables available were the previous sales of lots in Strader Subdivision and that it was not necessary to seek additional comparables. This conclusion certainly appears to be reasonable. It is noted hereinabove that this witness assigned individual values to the lots, commencing with Lots 14-25 at a value of $20.00 per front foot, Lots 31-36 at $20.00 per front foot, Lots 37-39, 49-59, and Lot 70 at $25.00 per front foot; and, Lots 60 and 61 and 65-68 at $23.00 per front foot. The witness was thoroughly familiar with the property and had been on it many, many times. His testimony clearly reflects that attention was given to each individual group of lots and his assignment of values clearly reflects the same.
Mr. Breeding, defendant’s second witness, used the same comparables as Mr. Derbes. His conclusion that the expropriated property has a value of $22.50 per *314 front foot is based on the following statement by him:
“In analyzing the sales it is noted that in the year 1956 with start of the sales, the sales averaged that year 11.40-feet per front foot, the comparable sales of 1957 averaged 19.50-feet per front foot, and the sales in 1958 averaged 22.50 per front foot. On the basis of these recent sales it is my opinion that the market value of these lots as of the date of the taking was 22.50, not allowing for any increase in 1959, which is apparent was the program for the subdivision.”
This witness likewise felt that it was' unnecessary to consider sales of lots on Jones Island because of the availability of sufficient sales in Strader Subdivision and because the Jones Island sales represented a 1954-1955 market and said lots were much smaller. We view this witness’s testimony as corroborative and supportive of Mr. Kuebel’s assignment of value.
The trial judge likewise assigned particular values to the various lots, all as detailed hereinabove. We must disagree with his assignment of values for the same reasons that we have assigned above for not adopting the values given by Mr. Derbes.
Accordingly, it is our opinion that the evidence in this case compels us to conclude that the testimony of Mr. Kuebel should be accepted as determinative of the value of defendant’s lands. He appraised defendant’s 39 remaining lots in the aggregate amount of $87,300.00 or $17,300.00 over the sum awarded by the trial judge.
We find the sum of $574.00 awarded for Parcels Nos. 4 and 5, comprising the strips behind Lots 12-41 and 46-78 respectively, to be correct.
We now turn to defendant’s claim for severance damages which was denied by the trial judge and quote with approval his reasons therefor:
“In resolving the issues presented at the outset the Court is not impressed with the evidence presented by Potter in attempting to show severance or consequential damages to have been caused to his acreage to the west of the borrow canal by the State’s expropriation of Potter’s land to the east of the borrow canal. While it is true Kuebel and the landowner’s other appraisers maintained there was severance or consequential damages to Potter’s remainder in sums from $10,-771.00 to $15,125.00, we believe that Der-bes testimony on this score is much more cogent and reasonable that Potter’s remainder has not suffered any severance or consequential damages as a result of the taking. The borrow canal for which Mollie McLeod had given the State a servitude in advance of Potter’s purchase is a permanent and legal barrier effectively and completely foreclosing any access to the highway to or from this property. The only method by which this property could be reached before, at the time of, and after the taking was by the waters of the borrow canal, and the Court believes that it is an established fact the bridging of the canal some 400 feet in width for as long a time as it is reasonable to envision would be wholly uneconomical, and particularly is this true when one considers the almost desolate and marshy type of the gumbo land to the west of the canal which, with its matted sub-tropical growth, will not permit or support the passage of a person for more than 15 feet beyond the west bank of the canal. In substance Potter contends that the taking has created an additional blockage by virtue of the intention of the State to cut off access to highway along the entire route, and as long as he and the other defendants landowners, retained the ownership of the land in Strader and before access to the road had been completely eliminated or was in process of being closed, there was a means of ingress and egress by boat across the canal, and then across Strader to the road. This position is unsupported, *315 and the means of getting to and from this property remains the same and has not been changed on account of the taking.”
The record fully supports the finding that defendant purchased the 200 acres because of its frontage on U. S. Highway 51 for in the defendant’s own words “I was only interested in lots, I wasn’t interested in acreage.” The record further shows that the lots subsequently developed by defendant comprised approximately one-third of the total acreage and that the balance or two-thirds of the acreage was west of the borrow canal. Defendant’s witnesses made no effort to assign values to the properties east and west of the borrow canal at the time of defendant’s purchase. This canal has a width generally of 80 feet but does extend to a width of 400 feet in certain spots. The above reasons given by the trial judge denying severance damages are fully supported by the evidence and should be affirmed.
Severance damages have been clearly defined as the difference between the market value of the condemned land immediately before and immediately after the expropriation. State, Through Dept. of Highways v. Williams, La.App., 131 So.2d 600; State, Through Dept. of Highways v. Gani, La.App., 138 So.2d 683; State, Through Dept. of Highways v. Davis, La.App., 149 So.2d 164; State, Through Dept. of Highways v. Huson, La.App., 166 So.2d 3; State, Through Dept. of Highways v. Lancon, La.App., 174 So.2d 257; Central La. Electric Co. v. Williams, La.App., 181 So.2d 844; Gulf States Utilities Co. v. Norman, La.App., 183 So.2d 421; State, Through Dept. of Highways v. Babineaux, La.App., 189 So.2d 450; and State, Through Dept. of Highways v. Fontenot, La.App., 194 So.2d 404. The evidence offered by defendant to establish severance damages does not meet the test of the aforementioned authorities.
Defendant also claims that he is entitled to additional sums for his expert witnesses and the cost of a surveyor. It is noted that this case is one of twelve cases which were consolidated for trial. We have before us only that portion of the record pertaining to Mr. Potter’s property. These twelve cases were heard by both district judges sitting en banc and separate decisions were rendered in each. For these reasons we do not find that the judge a quo committed manifest error in the proration of expenses and particularly that portion attributed to defendant’s case.
Defendant also claims that he is entitled to recover the sum of $2,000.00 which represents fees paid to Mr. G. C. Gandolfo for the latter’s survey of Stra-der Subdivision. The evidence is quite clear that Mr. Gandolfo’s services were required to correct errors made in a previous survey by another surveyor for defendant. Assuming, however, that it was necessary for other reasons to resurvey Strader Subdivision defendant would still not be entitled to recover for this expense. Defendant is urging that his property is a duly recognized subdivision and that he is entitled to have his lots considered as such. Having taken this position, defendant must bear the expenses necessary to subdivide his property. This is an expense that must be borne by a landowner who claims and receives enhanced value by virtue of his property being subdivided.
For the above and foregoing reasons the judgment of the district court is amended to increase the award to defendant as just compensation for the expropriation of defendant’s lands in the amount of $17,300.00, or from the sum of $70,574.00 to $87,874.00, together with legal interest on $17,300.00 from January 22, 1959 until paid. In all other respects the judgment of the district court is affirmed. The plaintiff herein is cast for all costs as are allowed by statute.
Amended and affirmed.

. Included acreage west of borrow canal.