HAWTHORNE, Justice.
This is an appeal from a judgment expropriating a tract of land owned by the defendants near the City of Shreveport for the expansion of the city’s water treatment plant situated on Cross Lake. The right of expropriation is not contested; the sole issue is the value of the property taken. The lower court fixed its value at $8,-455, and defendants appealed.[1]
The land expropriated in this suit is just outside the northern corporate limits of the City of Shreveport, three and one-half miles from the business center of the city. It is adjacent to property owned by the city which is used for the municipal water plant, is near the Shreveport-Blanchard road, a heavily travelled asphalt highway, and overlooks Cross Lake, which is close by. Public transportation is available, for a public bus passes near the property, and a trolley line is within walking distance. The Booker T. Washington School is about a mile away, and a grade school is located in the vicinity. The tract is of an irregular shape and contains approximately three and one-half acres.
The amount due for private property expropriated for public purposes is its market value when taken. See art. 1, sec. 2, La.Const.1921; American Tel. & Tel. Co. v. East End Realty Co., 223 La. 532, 66 So.2d 327. Market value has been defined by this court as “the price paid in *74 a voluntary sale between a willing seller and purchaser”. Louisiana Power & Light Co. v. Simmons, 229 La. 165, 85 So.2d 251, 253. Most important in determining market value in proceedings of this sort are sales of similar or comparable property in the vicinity, Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541, and cases there relied on; but if no evidence of comparable sales is available, value must be determined by a consideration of other factors, such as the opinions of experts, in which case the opinion of each witness qualified and accepted as an expert should be given effect if it appears to be well grounded from the standpoint of sincerity and good sense. See Domino v. Domino, 233 La. 1014, 99 So.2d 328.
Defendant Jones acquired the propty in June, 1951, for $7,000. About two years later he caused it to be subdivided into 15 lots and filed a plat of the subdivision, designated as Melwood Park, in the conveyance records of Caddo Parish. He caused a street or road to be dug from Blanchard Road across the’ property, and had a culvert for drainage placed along one side of the street. He spent for the survey, the construction of the road or street, and the culvert approximately $500. In 1955 he sold two lots in this subdivision, Lots 1 and 2. These are the only lots in the subdivision which front on Blanchard Road, and are conceded to be the most desirable lots in the subdivision. He received $2,500 for one of these lots, and $2,700 for the other. The 13 lots remaining after 'these sales comprise the property which the city is expropriating in these proceedings. Eight of these lots are 60 feet by 130 feet, and the other five are irregular in shape.
Defendants received a bona fide offer of $2,400 for Lot 3 of this subdivision, but the sale was not consummated because the prospective purchaser learned that the city was about to expropriate the property. Furthermore, there is evidence that another person was interested in the purchase of Lot 4 and was willing and able to buy the lot and to make a substantial down payment. He likewise learned of the expropriation proceedings, and this ended the negotiations.
It is the position of the city that the property here involved has a value of $960 per acre, and that a fair price for the whole is $3,560, the acreage value plus $200 which had been expended by the owner for engineer’s work in laying out the subdivision. In support of this contention it relies on the testimony of three expert appraisers, who were in agreement on the above valuation. They appraised the property as raw acreage adaptable as a subdivision. They took into consideration in fixing the value of the property the fact that there is no drainage or sewerage available to these lots, that a prospective purchaser of a lot would not be able to get a permit for a septic tank, that the street across the property was practically inaccessible, and that to make these lots salable the owner would have to incur a great deal of additional cost for drainage, water, sewerage, etc. These experts were not impressed with the prices paid for Lots 1 and 2. It was their opinion that those two lots could not be compared with the remaining 13 lots in the subdivision, which were rough and irregular and sloped sharply as much as 50 feet in some places.
Appellants’ expert appraisers, on the other hand, valued the property at $13,000, or $1,000 per lot for the 13 lots remaining in the subdivision. They reasoned that although the terrain was rough, the property was the best Negro subdivision outside the City of Shreveport for the following reasons : It is only three miles from the downtown section of the city; it has a view of Cross Lake; it is only a quarter of a mile from a trolley; a bus passes in front of it; schools are near; there is fishing in Cross Lake; and the lots are larger or wider than the average city lots. The appraisers also took into consideration the cost to appellants of $7,000 and the advance in real estate values since 1951. One of these experts testified that in a Negro subdivision a little farther around the lake — also with *75 out water and sewerage, with only a graded road, and with smaller lots — the lots were selling for $800 apiece.
In the instant case under the principles of law set out above we are called upon to determine the market value of the property when taken' — i. e., “the price paid in a voluntary sale between a willing seller and purchaser”; and most important in determining market value are sales of similar or comparable property in the vicinity.
In the instant case we have sales of two lots in this very subdivision, made in 1955 for $2,500 and $2,700. Moreover, $2,400 was offered for one of the remaining lots shortly before the expropriation proceedings were begun. It is also significant that lots were being sold in a comparable Negro subdivision near by for $800 each. Further, in view of the fact that Jones in 1951 paid $7,000 for the land which he subsequently subdivided, and that even the city’s experts conceded that land values had increased since 1951, and in view of the sales made from the property itself and negotiations for a further sale, we think the city’s experts’ method of evaluating the property as raw acreage suitable for a subdivision was unsound and resulted in too low a valuation.
However, we think the value placed on it by appellants’ experts of an average of $1,-000 per lot, or a total of $13,000, is somewhat high. It is conceded that the two lots sold were the most valuable and desirable in the entire subdivision, and some of the remaining 13 lots have a higher value than others, principally because of the irregular terrain of the tract. However, taking into consideration the sales of the two lots and the other features which we have discussed, we think a fair average value of these 13 lots is $850. We shall therefore increase the total award to $11,050.
For the reasons assigned the judgment appealed from is amended by increasing the award from $8,455 to $11,050, and as thus amended the judgment is affirmed.
FOURNET, C. J., absent.

. The City of Shreveport in brief filed in this court seeks a reduction of the amount of this award. However, since the city has neither appealed nor answered the appeal, any question of reduction is not before this court.