BAILES, Judge.
This is an appeal from a judgment of the trial court awarding Al H. German, defendant, judgment against the Recreation and Park Commission for the Parish of East Baton Rouge, plaintiff, in the sum of $209,-680, plus legal interest from date of judicial demand and all such costs of court as is required by law, as compensation for the expropriation of certain property located in East Baton Rouge Parish.
Defendant has timely answered the appeal and seeks an increase in the amount of the award to the sum of $298,570 for the property expropriated,’ and seeks an increase in the expert witness fee award for Kermit Williams and John F. Lejeune, his appraisers.
We find that just compensation for the property expropriated is the sum of $169,-680, the amount offered by plaintiff and rejected by defendant, and the defendant is cast with payment of all court costs.
The property involved in this expropriation is a tract of land consisting of approximately eight acres located contiguous to and on the east side of Nicholson Drive, the thoroughfare connecting the LSU campus with downtown Baton Rouge, in the municipal block bounded by Nicholson Drive, Johnson, Iowa, and Van Buren Streets. Two parcels of land are involved: one tract designated as B-l measuring 722.21 feet along Nicholson Drive, 325.37 feet on the north side, 716.73 feet on the east or back *471 side and 280.35 feet on the south line. The other tract, which is partially contiguous to the above described tract, consists of four lots designated as C-l, C-2, C-3 and C-4. These four lots together form an area of ground having a front on Iowa Street of 405.56 feet by a depth of 260.5 feet on the north side and 290 feet on the south side.
A portion of the rear of both of the above described tracts aré contiguous. Their contiguity commences 454.12 feet south of the northeast corner of the tract designated as B-l. This contiguity runs from that point south between the rear of these two tracts for a distance of 262.61 feet.
The municipal zoning classification of the B-l tract is A-l and for the other tract is A-3. A-l classification is residential and A-3 is multi-family dwellings of four or less stories in plexes of four or less.
The defendant acquired this in two separate transactions. His first purchase was of Lot C-l, which measures 126 feet on the west side of Iowa Street by a depth of the south side of 274.82 feet and on the north side of 260.63 feet and a width on the rear of 126.87 feet. This purchase was from Mrs. Wilma Lockhart for the price of $17,000, on January 12, 1965. The remainder thereof was purchased from Mrs. Anna Belle Hart Anderson for the price of $126,500, on September 2, 1965. Admittedly, defendant paid a realtor’s commission of $8,000, bringing the total purchase price of subject property to $151,500.
Article 1, Section 2 of the Louisiana Constitution provides that,
“ * * * [ejxcept as otherwise provided in this Constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid.”
The Supreme Court of this State, in State Through Dept, of Highways v. Barber (1959) 238 La. 587, 115 So.2d 864, said:
“[1,2] We reiterate that the general rule is that the measure of compensation to be awarded the owner in expropriation proceedings is the price which would be agreed upon at a voluntary sale between an owner willing to sell and a purchaser willing to buy, in other words, the market value of the property. It is well established that recent sales of comparable property are the best criteria of value in expropriation proceedings. * * *
The principle of law has been often repeated in the jurisprudence as the correct guide for determining the value of any given property. See City of Shreveport v. Jones (1959) 236 La. 727, 109 So.2d 72; Louisiana Power and Light Co. v. Simmons, 229 La. 165, 85 So.2d 251; Housing Authority of New Orleans v. Boudwine, 224 La. 988, 71 So.2d 541; Efurd v. City of Shreveport (1958) 235 La. 555, 105 So.2d 219.
LSA-C.C. Article 2633 provides:
“In estimating the value of the property to be expropriated, the basis of assessment shall be the true value which the land possessed before the contemplated improvement was proposed, and without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work.”
This same provision is repeated in LSA-R.S. 19:9.
Plaintiff offered the testimony of Mr. Heidel Brown, whom the trial court accepted as an expert appraiser. This was the only witness of the plaintiff for the purpose of establishing value. The defendant offered the testimony of two appraisers, Messrs. Kermit Williams and John Lejeune both of whom were accepted by the court as experts also.
Mr. Heidel Brown found the property had a present total value at the time the suit was filed of $169.680. He explained that he considered the best comparable to use in fixing value was the transaction by which defendant acquired the property from Mrs. Lockhart and Mrs. Anna Belle Hart Ander *472 son. This was a total of $143,500, or $17,-000 for the property acquired from Mrs. Lockhart and $126,500 for the property acquired from Mrs. Anderson. Added to this as a part of the consideration was the sum of $8,000 which defendant paid as a realtor fee. As this purchase was, for the most part about one year prior to this action, Mr. Brown added the sum of $18,380 in order to adjust the price upward to allow for the advance in the real estate market generally.
He testified that he used other sales, although a number of them were of transactions which preceded defendant’s purchase by several years, to verify and substantiate the price he found applicable. It was his opinion, from his own investigation of the transaction, that the transaction reflected an honest arm’s length sale and purchase between the parties; that it was between a seller who was willing to sell and a buyer who was willing to buy. He determined that the highest and best use of the property was to divide the area fronting on Nicholson Drive into about five lots for use in building sites of high grade, prestige, luxury type residences. It was also his opinion that the four lots facing Iowa Street could best be utilized in the construction of residences of A-l classification.
Mr. Brown stated that the main approach to value was not the division of the ti ret into lots, but that the governing and controlling comparable was the price defendant paid for the property. It was a recent sale of the exact property involved. He stated that on the basis of this approach the north 370 front footage has a value of $175 per front foot, the remaining 352 feet, a value of $120 per front foot. His findings, verified by other comparables in the vicinity of this property, established a value on Lot C-l of $19,000, Lot C-2 of $120 per front foot, Lot C-3 of $100 per front foot, and Lot C-4 of $80 per front foot.
It was his opinion that tract B-l could best be divided into about five lots of about 150 feet fronts by a total depth of the B-l tract.
As to the value of the house located on tract B-l, known as the Prince Murat House, he testified that in his opinion its historical and architectual value was included within his appraised value. It was his opinion that the sale from Mrs. Anderson to defendant, although it was the sale of the property in one tract (except the single lot acquired from Mrs. Lockhart) represented the same total sale price as Mrs. Anderson could have sold the property for as separate lots.
On page 556, Mr. Brown testified:
Cross-examination by Mr. Craig:
“Q. In fact, you are saying that Mrs. Anderson got as much from Mr. German by selling it as one tract as you think it could be sold for as residential separate lots?
A. Well, approximately, I think I have already said that earlier, maybe in different words, but I said in double checking this transaction to see if there was any reason to make it suspect, that I did break it down tentatively into some smaller parcels to see what they would bring and it ended up about what I put on it.
Q. You don’t believe that Mr. German, as a developer, could divide that up as you say it should be divided to achieve its best use, and make any profit on his purchase of that property, any substantial profit?
A. Mr. Craig, with Mr. German’s background, I believe — and there is nothing in the record to make me believe otherwise — that he evaluated the possibility of having it rezoned, because his business history doesn’t indicate that he would buy this to subdivide it into residential lots.
*473 Q. He testified he bought it for the possibility of rezoning it for that purpose, but what I am asking you is — he is a residential developer — is it your testimony that you do not believe that Mr. German, as a residential developer, or almost anybody, as simply as this could be developed, could make a profit by dividing that tract into separate residential lots and selling it over and above what he paid for it?
A. No, sir, not much. It has been for sale for — to my knowledge, for four years with a price tag on it not much different.
Defendant’s experts, Messrs. Williams and Lejeune, had an entirely different approach to value from plaintiff’s expert. As between them, they used the same com-parables and approached market value on identically the same basis. It was their opinion that the highest and best use of the property fronting on Nicholson Drive was for prestige luxury-type residences. They stated they could find no sale of comparable property in the vicinity of subject property within a year of the filing of this action. They reasoned that the nearest comparable to this type property were certain lots in Bocage and Belle Pointe Subdivisions. It was their opinion that the proper manner of determining market value was not on a comparable front footage basis but on a square foot basis.
There were certain development costs, considered applicable by both Mr. Williams and Mr. Lejeune. These costs consisted of $1,000 for cost of a survey for the purpose of dividing tract B-l into seven lots, six of which would have a frontage of 100 feet each, and the lot on which the house (The Prince Murat House) would be located would have a frontage of 122 feet, and the balance for the construction of a shell road from Iowa Street to the rear of the said projected seven lots. It was their position that the lots, so subdivided, with 100 foot fronts would not have enough width to afford a driveway extending from Nicholson Drive to the residence, and further that this type prestige property is better served with a rear entrance. They proposed a twenty-five foot private shell road extending from Iowa Street along the north line of Lot C — 1, then extending along the rear of the five inside lots. The shell road would have the shape and form of an inverted T.
Mr. Brown did not agree that this sort of entrance to the property was desirable. As stated he proposed not more than five lots subdivided from Tract B-l with the lots being fashioned in a manner to follow the contour lines to make the most utility of the terrain and shape of the ground.
They found that as the subject property was considerably deeper than the compara-bles they found in Bocage and Belle Pointe Subdivisions. With the subject property having a depth of from 280 feet to 325 feet, and the comparables, above noted, with a depth of 200 feet, it would be unreasonable to base the value of subject property on a like front footage price. Mr. Williams fixed a value of 78 cents per square foot on subject property, as this was .the average price of six separate lots which he considered comparable. He found subject property had an area of 240,476 square feet. This gives an indicated value of $187,570, less a development allowance of $12,000, leaving a net value of $175,570. Mr. Lejeune computed a value of 70 cents per square foot. He placed a value of $167,585 on Tract B-l, less a development cost of $12,000, leaving a net value of $155,585.
Using this same basis for. computing value of Lots C-l, C-2, C-3 and C-4, they compared this property to that at University View Homesites south of the LSU campus. Williams found the square foot value to be 73 cents per square foot and this figure multiplied by 113,700 square feet resulted in a value of $83,000. Mr. Lejeune fig *474 ured a value of 80 cents per square foot, arriving at a total value of $96,200.
Mr. Williams put a value of $40,000 on the Prince Murat House and Mr. Lejeune placed the value at $50,000. Neither could in any way substantiate this price, concluding only that it was their opinion.
To recapitulate the findings of the defendant’s witnesses, Mr. Williams valued the property as follows:

We find that a determination of value on a square foot price basis is invalid, unreasonable and fallacious in this case. Defendant based the square foot price on the price of property of unlike depth and unlike terrain. The subject property offers possible building sites on the most rear portions of the property. It is noted on the elevation map that there are elevation differences of from 23 to- 40 feet, or stated differently, the difference between the low and the high of this property is 17 feet.
The invalidity of computing a value on a square foot basis is pointed up by the following testimony of Mr. Brown.
By Mr. Stewart — page 542
“Q. Are the Bocage lots as used in the comparábles by Mr. Williams comparable in frontage to his proposed 100 foot lots of the subject property on Nicholson Drive?
A. No, all of those he used were at least 150 feet wide and most of them were wider than that, and the reason we found that people went to — in a planned neighborhood, it is better to not have the garage or carport face the street, so you just need a wider lot to permit entry to the carport or garage from the side. In fact, Bocage is restricted against garages and carports facing the street, but when you build an expensive home, people want a little more insulation and you get the 100 foot lot, although many attractive homes are built on 100 foot lots.
Q. Can you compare a 150 foot lot with a 100 foot lot on square foot basis and come up with a comparable?
A. Well, I guess you could compare them, but we really sell commercial and industrial properties on a square foot basis, although even there, your market is related to front foot, because there is a certain prestige and advertising value related to your front foot exposure. *475 Apartment sites, more emphasis is given to square footage, because of the zoning requirements. The typical residential lot is, in my opinion, it has been my experience, sold on a front foot basis and, with adjustments, I would say, two lots side by side with the same frontage, one was deeper than the other and they were identical in every way, other than that, the deeper lot would bring more, but if it were SO feet deeper, which made it one-fourth deeper than the one next door, it wouldn’t being one-fourth more, so I think to that extent the square foot approach is really not applicable, not as applicable as the front foot approach.
Q. Would you compare for us the 150 foot lots as compared to a 100 foot lot next door, all things being equal, with the square footage being adjusted between the two by giving the 100 foot lot more depth ? How would they compare?
******
BY THE COURT:
Q. You say that they are not comparable on a square foot basis, because of what, now?
A. I say that the square basis of comparison is not as valid as the front foot, because, given a buildable lot — and by that I mean a lot that is adapted to residential use — people attach more importance to frontage than depth, after you reach an adequate depth. The idea of a back yard garden and things like that just is not as important as it used to be.
Q. And with regard to these lots and being some 50 feet at least longer in depth covered by the subject property, don’t you think that would add to the value of the lot more than just one out there in Bocage 200 feet deep?
A. Yes, sir, I think that a deeper lot, if they are identical in every other way, is worth more than one that is not as deep, but what I am trying to say is that the 200 foot depth in Bocage is adequate, because the lots are flat and you don’t have to go 200 feet from the street to build. Now, here on Nicholson Drive at this point, because of the contours, you have to go — I don’t know whether its 200 feet, maybe its 150 feet, to reach the brow of the hill. I don’t say that’s bad. I think that gives the house that would result — could give it an attractive appearance, looking down on the street in front of it, but I don’t think that if you add one-fourth or 25% to the depth of a lot, you do not add 25% to its value, because as it gets deeper, the square footage is worth less.”
The plaintiff, both in the trial court and before this court, made the contention, “that any claim to historical significance for this old house on its claim that Murat owned and occupied the same is spurious.” In order to put at rest this argument of the plaintiff’s, the record abounds with evidence that this property is regarded by the public as the house in which Prince Murat lived. Prince Murat was a son of the youngest sister of Napoleon Bonaparte, and his full name was Charles Louis Napoleon Achille Murat. Whether he actually owned the property is immaterial. Beyond any doubt whatever, it is on the basis of this fact, that is, that the public regarded this house as the place where Prince Murat lived while a resident of this area between 1835 and 1837, that various individuals and historical organizations moved the plaintiff to expropriate this property. The testimony of Mr. William R. McGehee, chairman of the Recreation and Park Commission is more than sufficient to establish the fact that the plain *476 tiff’s sole interest in this property is for the purpose of preserving the Prince Murat House. Mr. Heidel Brown, plaintiff’s appraiser, testified that he was aware of the historical identification of Prince Murat with this property.
There is no legal basis for this court to accept the defendant’s appraisers’ estimates of value of the house. Neither could assign any logical reason for fixing the price at $40,000 and $50,000 respectively. In his dealings with Mr. J. Burton LeBlanc for the removal of the house from the subject property, prior to the time plaintiff became interested in the property, defendant placed no significant value on the house. We find that the house took on such extraordinary value only after the plaintiff became interested in the preservation of the house as the Prince Murat House.
We believe the defendant had knowledge of the identification of the house, both historically and architecturally. Certainly, beyond any doubt, Mrs. Anderson was fully aware of the historical attributes of this old house, and it is equally inconceivable that she did not include within the sale price of the subject property the value of the house at that time. Mr. Brown testified that he felt the value of the house was included in the sale price of the property, and that the property had been on the market for four years. He put a separate value of $7,500 on the house. It is further observed by us that defendant purchased this property for the real purpose of constructing a high rise apartment house and that his plans included either the razing or the relocation of the house.
It is our finding that the fair market value of the subject property, including all improvements, is the sum of $169,-680.
Plaintiff, in its supplemental brief, states that if the judgment of the trial court is reduced it should have judgment in its favor and against the defendant for the amount of such reduction. Our search of the record fails to reveal any evidence of payment of the judgment by the plaintiff. It is true that LSA-R.S. 19:13 provides that the plaintiff, in the event of reduction of the judgment on appeal, shall recover the surplus paid; however, our search of the record fails to reveal any evidence of payment of the judgment rendered by the trial court. As there is a question of fact to be resolved, i. e., the payment of or the deposit by the plaintiff of the amount of compensation due defendant under the judgment of the trial court, we cannot make this determination from the record. This matter will have to be remanded to the trial court for this restricted purpose.
The plaintiff offered to purchase this property from defendant for the sum of $169,680, and alleged that this was a continuing offer, although it alleged the offer was rejected by defendant. Defendant, in his answer, admitted plaintiff offered him $169,680 for the property, and that it was rejected. Under such a state of facts, the plaintiff was relieved of the formal tender of this amount. See La. Highway Commission v. Bullis et al. (1941) 197 La. 14, 200 So. 805; Texas & Pacific Ry. Co. v. Mengel Co. (D.C.1945) 62 F.Supp. 752; Calcasieu & S. Ry. Co. v. Kinder Canal Co. (La.App., 1953) 69 So.2d 537. Thus, under the provisions of LSA-R.S. 19:12, the plaintiff is relieved of the payment of all costs.
We find the trial court was in error in awarding the defendant legal interest from date of judicial demand until paid. The plaintiff was not entitled to possession of the property until there was a judgment of the trial court expropriating the property and fixing the compensation due the defendant. The judgment, at that time, became executory both as to the plaintiff and the defendant. The amount of compensation which the defendant was entitled to receive was not judicially determined until that date, and *477 the plaintiff was not entitled to possession of the property until the trial court determined the amount of compensation the plaintiff must pay for the property. Therefore, the defendant is entitled to be awarded legal interest on the compensation due him from the date of the judgment of expropriation. See State of Louisiana, through the Sabine River Authority, State of Louisiana v. Miller, et al. (1967) 250 La. 668, 198 So.2d 397.
For the reasons assigned, the judgment of the trial court is amended by reducing the'amount of the award of compensation due defendant from $209,680 to $169,680, together with legal interest thereon from December 28, 1966, the date the judgment was signed by the trial court, until paid, and this matter is remanded to the trial court for further proceedings not inconsistent herewith and for the restricted purpose stated above. Defendant to pay all court costs.
Amended, and as amended, affirmed and remanded.