JOHNSON, Judge.
Board of Commissioners of the Port of New Orleans, the plaintiff, is an agency of the State of Louisiana, and is the governing authority of the Port of New Orleans. By law it is clothed with power and authority to expropriate private property for public use upon prior payment of just compensation. On September 22, 1966, in the Civil District Court for the Parish of Orleans, plaintiff filed this and four other separate civil actions against the respective owners of five separate tracts of land to be acquired by expropriation and to have the court determine and adjudge the amount to be paid the respective owners as just compensation for the land and for any damages to which said owners may be entitled. The five cases were consolidated for the purpose of trial in the district court. In due course judgment was rendered in each case decreeing ownership of the land in plaintiff by expropriation upon payment to the respective owners the amount fixed in each judgment with interest, the costs to be paid by plaintiff. Each judgment further decreed that plaintiff be placed in possession of said property upon the payment of the amount awarded in the judgment. On motion of plaintiff the trial court granted an order for devolutive appeal in each case, The respective defendants in each case answered the appeal praying that this court amend the judgment by increasing the award made by the trial court. The five cases were consolidated for argument in this court and separate judgment will be rendered in each case.
The other four actions consolidated herein for argument are respectively entitled and designated in this court by our docket No. 3309, Board of Commissioners of the Port of New Orleans v. Vincent et al.; docket No. 3310, Board of Commissioners, etc. v. Lichentag; docket No. 3311, Board of Commissioners, etc. v. Panzeca et al.; docket No. 3312, Board of Commissioners, etc. v. Dreyfous et al., 220 So.2d 504—506. This discussion applies equally to each of those four actions and to the decree which we will separately render therein.
After the appeal records were lodged in this court and before argument, plaintiff presented a motion for permission to file in evidence in this court copies of two deeds to land. One of the documents is said to describe land purchased by one Jack Perry in 1962, and the other document is said to describe land sold by Perry to Aurora Properties, Inc., in 1965. One of the appraisers for defendants used the sale to Aurora Properties, Inc.,'as a comparable toward finding the market value of subject properties and the trial court also relied to some extent for the same purpose on the purchase by Aurora Properties, Inc., from Perry. The motion to permit the filing of these documents as new evidence alleges that the appraiser and the trial court made a miscalculation of the acreage of the land purchased from Perry and that the deeds would disclose that mistake. The appraiser who used the Aurora land as a comparable testified as a witness for defendants and was cross-examined by counsel for plaintiff. The appraiser’s report' and his tes *491 timony gives the acreage of that land at 142 acres. Counsel’s motion now alleges that the correct area is 228 acres, hut never at any time during the trial did counsel question the correctness of the appraiser’s report and testimony showing the amount of that land to be 142 acres. Plaintiff’s motion alleges that if its motion to file the documents in evidence in this court is denied then in the alternative the cases should be remanded to the district court with instructions to receive plaintiff’s documents in evidence. Counsel for defendants have filed opposition and supplemental opposition to plaintiff’s motion to file the documents in evidence in this court or to remand the cases, but if plaintiff’s motion is granted to do either, the supplemental opposition in the alternative submits a list of 10 documents which counsel for defendants contend should be admitted in evidence on behalf of defendants.
This court is without original jurisdiction and cannot authorize the filing of additional evidence while the records are here on the appeals. A study of the transcript and exhibits in these records has led us to the conclusion that the copies of the deeds submitted by plaintiff are not necessary for proper disposition of these appeals. It should not need the citation of any authority to support the holding that additional evidence cannot be received by this court because that ruling has been made many times by appellate courts in this state. Inasmuch as the filing in evidence of copies of deeds to lands used as compa-rables in the trial court was waived and dispensed with by agreement and stipulation of all counsel during the trial, and in view of the absence of any testimony by any witness either on direct or cross-examination to suggest or indicate the necessity that these documents be placed in evidence, and also for the further reason that we find it is possible for this court to pronounce definitively on the issues without the copies of the deeds to the various tracts of land, the motion of counsel for plaintiff to admit the evidence or remand the cases must be denied. Constitution of Louisiana, Article VII, § 29; Lafleur v. National Health & Life Insurance Co., La.App., 185 So.2d 838; Naquin v. Iberia Parish School Board, La.App., 157 So.2d 287; Kinchen v. Billinger’s Estate, La.App., 146 So.2d 416; RDM Corporation v. Macaluso, La.App., 134 So.2d 127; Leon v. St. Bernard Parish Democratic Committee, La.App., 117 So.2d 447; Higginbotham v. Inland Empire Ins. Co., La.App., 88 So.2d 711; L. A. Frey & Sons v. Town of Slidell et al., 173 La. 397, 137 So. 193.
Plaintiff’s petition in each action alleges that plaintiff by its resolution has found and the petition reiterates that the public interest requires the acquisition of the property therein described. The copy of the resolution attached to the petition stipulates in part that the land is needed by plaintiff in the aid of commerce to meet the requirements of the traffic of the Port of New Orleans and that the public bulk terminal of New Orleans (adjacent to subject properties) must be expanded so as to be made available for a greater number of uses, and that its capacity and efficiency should be increased.
The answer of the owner or owners in each suit generally denies the allegations of the petition. The answers were either not filed within ten days of notice of the date of trial or did not set up any special defenses. Therefore, the proper issues in the trial court pertained only to determination of what amounts the plaintiff should pay the defendants, and that is the only issue before this court. LSA-R.S. 19:6, 7.
The respective defendants in these cases own a parcel of land one arpent (about 192 feet) wide extending northward from a line 300 feet north of the Mississippi River-Gulf Outlet (hereinafter sometimes - called Gulf Outlet) to Almonaster Avenue and beyond. Plaintiff seeks to expropriate the southern portion of these five parcels which southern portions together form an almost rectangular area comprising 19.648 *492 acres in Sec. 42, Tp. 12 S., R. 12 E., in the Gentilly section of New Orleans. The line across the north end of the southern portions of these five strips sought to be expropriated is about 1,600 feet south of the extension of Almonaster Avenue. The plaintiff already owns land on the north side of the Gulf Outlet, a part of which separates the southern end of the five parcels of defendants from the Gulf Outlet. A portion of plaintiff’s land extending northward from the Gulf Outlet is adjacent to the west side of the southern portion of parcel No. 85 sought to be expropriated. The other parcels sought to be expropriated are the southern portions of parcels numbered 86, 87, 88 and 89. On the land owned by plaintiff lying south and west of the southern portions of these parcels the plaintiff had constructed its bulk terminal at a cost of approximately $19,000,000.00, which bulk terminal furnishes facilities for loading and unloading dry cargo to and from ships on the Gulf Outlet.
Each of the five parcels sought to be expropriated is separately owned by the person or persons named in the respective judgments. Each parcel is evaluated independently because no two parcels contain exactly the same area. There are no improvements of any kind on any of these properties. The surface of the whole area made up of the five parcels here involved is essentially the same type of low, marshy terrain, without proper drainage and with elevation not over two feet above sea level. By municipal ordinance the property in this area is zoned “L”, heavy industrial district. It was stipulated by all counsel in the trial court that the value of the whole area sought to be expropriated shall apply to each parcel of land at the same rate. The reports of the experts for both sides have used the square foot as the unit of ap-praisement and the judgments have followed that method.
Counsel for plaintiff, through expert witnesses, has devoted a great deal of testimony to develop tests and studies of soil conditions in an endeavor to prove that the land is useless and valueless. Counsel’s theory seems to be that the land should be appraised at some very low price from which should be deducted the full cost of building a foundation, shoring, piling, filling, draining, etc., etc., to make each area ready to receive construction of some type of heavy industry, and its engineers calculated the cost at some large amounts which it wants defendant to pay. Counsel’s experts made logs of borings to determine the compressibility, the degree of subsidence and weight bearing capacity under given conditions. If the land is not usable, as counsel contends, and we adopt his theory then we might wind up requiring defendants to pay plaintiff to take the properties off their hands. We cannot believe that counsel is serious in this method of appraising value of property for expropriation purposes.
Counsel for plaintiff contends that the trial court committed error in finding the subject property usable and in not taking into consideration the cost of making the property ready to receive heavy construction. The trial court stated in his reasons for judgment that it must be conceded that the land is not ridge land but land that is low and because of lack of drainage up to this time must be designated as swampy or marshy. The trial court found as a fact that the property is usable at this time and the highest and best use is by industry that required shipping transportation.
We say that the trial court was not concerned about how much the plaintiff or any owner will have to spend to make a foundation strong enough to support improvements the owner would put on this land. In expropriations the court must take the land as it is and find its value by the various accepted methods including the future prospects affecting valuation. The type and cost of preparation of the land to receive improvements would depend somewhat on the type of improvements to be constructed on it. While studies of this kind may throw some light on the value and use of land, the court is not so much *493 concerned with the cost of bringing the surface to a fixed standard of solidity. Counsel complains that “the court did not take this all important item into consideration in arriving at its conclusion of value.” Indubitably the court is concerned about the bad condition of the surface of land to be expropriated but not to the extent of trying to find the cost of making the surface solid enough to support heavy construction. It does seem that plaintiff went to undue lengths and no doubt great expense to show that the land was compressible and unable to support heavy industrial buildings in its present condition when everybody knows that land in this locality will require considerable deep piling and perhaps other means to create a solid foundation. That is done all over New Orleans and we assume it can be done there. We make that assumption largely for the reason that plaintiff has already constructed heavy improvements on the soil within a few feet of the land they now seek to expropriate. Soft, spongy, low, marsh, wet soil conditions have long since ceased to be an insurmountable obstacle to heavy construction in New Orleans. This much is common knowledge. It is plainly demonstrated at this very spot by the presence of the Bestwall Gypsum plant and plaintiff’s bulk terminal and dock facilities adjacent to subject property. Drainage is a big problem. It is said that the levee built along Elaine Street on the west side and the levee along the Gulf Outlet to the south holds water on properties of defendants. There is evidence that the Sewerage & Water Board of New Orleans has plans for pumping stations in the area between the Industrial Canal and Paris Road which it is claimed should relieve this situation. The evidence shows that utilities such as gas, water, electricity and a railroad are available within 900 feet.
Mr. O. F. Kuebel was plaintiff’s expert appraiser. He first listed 25 sales made by various people to the City of New Orleans in 1964, 1965 and 1966, for the extension of Almonaster Avenue, which runs east and west about 1600 feet north of the north end of subject properties. These small tracts for the street right of way are located along the avenue to the north and the northeast of subject properties as far away as 14,000 feet. These sales were made without expropriation proceedings and, as Mr. Kuebel said, they are not controlling. However, they are entitled to some consideration and it is reasonable to assume that the owners accepted less than they might expect by a court judgment. The smallest price shown in this list was $0.1865 per square foot for a tract of little less than a half acre and the largest price was $0.3282 per square foot for slightly over five acres. Yet, Mr. Kuebel estimates the value of subject properties at $0,149 per square foot.
Mr. Kuebel listed an additional five sales (between private parties at other locations) in 1961 at prices from $0.0376 to $0.0764 per square foot; three sales in 1963 at $0.0727, $0.0763 and $0.2075 per square foot, and one sale in 1966 at $0.3165 per square foot. By these comparables it is plain to see the remarkable increase in land values in that five-year period.
In this type of proceeding valuation is usually reckoned as of the date of taking. While these suits were filed on September 22, 1966, that is not the date of taking for the reason that there was no taking of property in these cases until judgments were rendered in favor of plaintiff and that was April 18, 1968. That is to say, that is the earliest plaintiff could have taken the land by paying the awards. Therefore, the prices prior to 1968 must be adjusted upward for time.
Mr. George A. Frilot, Jr., was an appraiser for defendants and apparently equally as well qualified as Mr. Kuebel. He lists one sale in 1964 at the unit price of 21$!; four sales in 1965 at 210, 240, 360 and 280; two sales in 1966 at 270 and 300, but this last property sold at $13,787.00 per acre which should be listed at $0,317 per square foot. All these sales must be adjusted up for time. These tracts are shown *494 to be located in relation to subject properties about the same as comparables used by the other appraisers. Just why Mr. Kuebel did not use some of these properties which sold at higher prices than the ones he used is not explained. To show the rate of increase in land values in that locality, Mr. Frilot refers to the sale made in December, 1951, of 8.59 acres at the unit price of 06$. Three and a half years later, in June, 1955, the owner sold 4.61 acres of that land at nearly four times the unit price he paid for it.
Mr. Frilot explains succinctly the reasons for the rapid trend upward in the value of land in that particular locality. He lists ten recent factors which have influenced this increase, including the sale of DeMont-luzin 32,000 acres between Paris Road and Chef Menteur Pass; installation of NASA Saturn Plant at Michoud a few miles east of the subject properties with resulting satélite industries, commercial, motel and residential development; the sale of Zemur-ray Tract of about 5,000 acres running from Downman Road to Paris Road; construction of 1-10 Highway connecting this area with the heart of New Orleans; location of high level bridge over Gulf Outlet at Paris Road; the proposed Mississippi River Bridge at Paris Road; extension of Almonaster Avenue; the proposed extension of Crowder Avenue from Chef Men-teur Highway to Gulf Outlet running immediately adjacent to Tract 89 of subject properties; construction of Mississippi River-Gulf Outlet passing within a few 100 feet of the south end of subject properties, and the construction of plaintiff’s bulk terminal with docks and loading and unloading cranes.
Mr. Frilot considers what has already taken place in that locality as clearly indicative of greater future activity and development to be reflected in property values. He quotes from the book entitled “Appraisal of Real Estate” published by the American Institute of Real Estate Appraisers, page 41 (4th Edition),.as follows:
“The principle of anticipation affirms that value is created by anticipated benefits to be derived in the future. It is not the past but the future which is important in estimating value * *
and at page 25 as follows:
“Change is ever present, irresistibly affecting individual properties, neighborhoods and cities. * * * The appraiser must always view real property and its environments with the law of change uppermost in mind. * * * For it is the future, not the past, which is of prime importance in estimating value.” •
Mr. Frilot values each of the parcels numbered 85, 86, 87, and 88 at 50^ per square foot and parcel number 89 at 60(é. He gives this additional value to parcel 89 because of the anticipated extension of Crowder Avenue which would border the east side of that parcel.
Mr. Philip Zollinger, an expert appraiser for defendants, discusses somewhat in detail sales, causes and effects, and after making adjustments for time and other factors he appraises each of four parcels as 53^ per square foot and one parcel, No. 89, at 58‡.
Mr. Jim Maloney, an expert appraiser for defendants, lists some of the same comparable properties as did Mr. Frilot and other sales and gave cogent reasons for his manner of adjustment. He appraises each of four parcels at 45^ per square foot and one parcel, No. 89, at 60^.
This brings us to consideration of the question of severance damage. The appraiser for plaintiff does not consider the remaining properties of defendants as occupying any less advantageous position than before the taking and says the properties are not damaged by the taking. All of the appraisers for defendants are of the opinion that the remaining properties will be damaged. The trial court does not allow for severance damage to any of the remaining properties. It is difficult to *495 reconcile the court’s reasons for not allowing severance damage with the cold fact that the southern front of all of the properties of defendants will be pushed north over 900 feet further away from deep water facilities which are cited as attractive factors giving increased value to properties along the Gulf Outlet. However, we accord to the court the discretion to which the trial court is entitled and accept his ruling. Parish of East Baton Rouge v. S & H Heating Company, La.App., 216 So.2d 360 (363).
It is our opinion that the values fixed by the trial judge are entirely in keeping with the trend of prices indicated by many sales and the existing and anticipated economic factors in that area. The judge explained his reasons with such clarity that we take the liberty of copying his reasons for judgment in full, as follows:
“The five above captioned cases were consolidated for trial, inasmuch as the five cases involved the matter of the expropriation by the Board of Commissioners of the Port of New Orleans of five adjoining and abutting tracts of land. The tracts of land are located in an area lying east of and adjoining the property of the plaintiff. The five tracts also abut the property of the plaintiff’s property fronting on the Mississippi-Gulf outlet. The defendants’ tracts of land extend in a northerly direction to and across the ‘extension’ of Almonaster Avenue.
“The properties being expropriated by the plaintiff consist of a total of approximately 858,000 sq. ft., amounting to approximately 19.648 acres, which is about one-fourth of the total of the tracts of land owned by the defendants of which the land to be expropriated forms a part. The property owned by the defendant, Roger C. Vincent, included in the above 858,000 sq. ft. consists of 131,631.68 sq. ft. and fronts on a proposed street known as Crowder Road. As of the date of taking, i. e. September 22, 1966, the defendants’ properties were approximately 500 ft. from the North side banks of the Mississippi-Gulf outlet; the intervening property being owned by the plaintiff and the Levee Board (the former having 300 ft., and the latter 200 ft).
“The transcript of the testimony in these proceedings will undoubtedly be voluminous, but the Court is of the opinion that only a very small portion thereof contains any testimony which is of value in permitting this, or any other, Court to reach a determination as to the market value of the property sought to be expropriated as of the date of taking.
“The property sought to be expropriated is zoned “L” Heavy Industrial Use. There can be no doubt that the best and the highest use for this property, located near the deep-water channel linking the Mississippi River and the Gulf and in close proximity to the large modern loading and unloading facilities, storage tanks, docks, etc., created by the plaintiff herein, is for use by industry that may require ship transportation for raw and/or bulk materials. Plaintiff’s expropriation of the property is for the purpose of ‘aiding commerce to meet the requirements of the traffic of the Port of New Orleans in that the Public Bulk Terminal of New Orleans must be extended so as to be made available for a greater number of uses, and so that its capacity and efficiency may be increased,’ for which purposes the additional land sought to be expropriated would be used.
“A great deal of plaintiff’s testimony, as well as that of witnesses for the defendants, had to do with the character and the type of the soil of the land sought to be expropriated. Plaintiff’s witnesses, however conceded that it is necessary that piling be driven on the property sought to be expropriated — as well as upon almost any other portion of land in the city of New Orleans — in order to prepare a proper foundation for any industrial structure. The only purpose, therefore, for determining the character of the soil and the topography of the land would be to *496 determine the length and type of piling required. It must also be conceded by all witnesses that the land to be expropriated is not ridge land, but land that is low, and because of lack of drainage, up to this time, the land may even be designated as swampy or marshy. Notwithstanding this fact, plaintiff’s witnesses have testified that the land is about three feet above sea level, which is several feet higher than land upon which the very heart and business section of the city of New Orleans is built. Therefore, whether or not pictures, which were taken and have been introduced in evidence by the respective appraisers for each side, are what they testify they represent; and whether the persons pictured in the pictures were actually on the property being expropriated, is of little or no importance to the Court in actually determining the value of the land as of the date of taking.
“Plaintiff’s case as to the value of the land sought to be expropriated, rests primarily upon the testimony of Mr. O. F. Kuebel, who has been qualified as an expert appraiser. In Mr. Kuebel’s report, under the heading of ‘Highest and Best use,’ Mr. Kuebel states:
“ ‘Highest and best use is defined as that use which will most likely produce the highest net income to the land over a reasonable period of time, or provide maximum benefits to the owner if used for his own purposes.
“ ‘Zoning restrictions covering the land, the existing uncleared swampy conditions, lack of drainage, utilities, and inadequate levee protection, preclude the use of the land for any purpose at this time.’
“The Court finds it difficult to reconcile this statement by Mr. Kuebel with his testimony given in 1965 in case Number 415-086 of the docket of this Court (which has been made part of the record in the instant case), in the matter entitled State of Louisiana, through the Department of Highways vs. Michel Glaser, in which Mr. Kue-bel testified as follows:
“ T say “anticipated” because as far back as 1958 I was the consultant for the Dock Board, at which time the Mississippi River-Gulf Outlet was under construction, and I know that the land on both the North and South side of the Mississippi River-Gulf Outlet will be acquired by the Dock Board for the future port of the city of New Orleans.
“ ‘That land is zoned “L” Heavy Industrial, even though some of it is divided into subdivisions and small lots. But I do know that that land is now in the process of being dried out, and as a matter of fact we are in the process of acquiring a big glob immediately East of the Bestwall Industry.’
“In case Number 416-361 of the docket of this Court, entitled State of Louisiana, through the Department of Highways vs. J. Richard Reuter (which proceedings were made a part of the record in the instant case), there is a photograph designated as ‘Defendant 15,’ on which is pictured an aerial view of the Mississippi River-Gulf Outlet showing the Dock Board’s facilities thereon, and a part of the property being expropriated herein, as well as the property which was the subject of the suit in the Reuter case. In that particular proceeding Mr. Kuebel testified as follows:
“ ‘In addition to that, I think there is another major factor which has not been generally known, but it is known to me because I have done some work for them, and that is the Dock Board’s plan to acquire approximately 1,000 ft. of land North of the intra-coastal waterway we now call the Mississippi River-Gulf Outlet, to create an expansion of the port facilities. The land, all in the area, is zoned “L” Heavy Industrial; can’t be used for anything but industrial purposes even though a lot of it is being sold as lots. But that is going to be a major factor in the development of the Eastern end of the city of New Orleans. That is *497 where a good portion of the tonnage coming in and out of the port will be shipped from the riverfront to the Gulf intra-coastal waterway and the Mississippi River-Gulf Outlet.’
“In that particular case, in which Mr. Kuebel testified in 1964, Mr. Kuebel placed a value on the property then being expropriated from Mr. Reuter, stating that it was worth $1.25 per square foot. In the same proceeding there is a photograph in evidence, identified as ‘Defendant 22,’ in which Mr. Kuebel appears with the defendant Mr. Reuter, and the topography of that land does not appear to the Court to be materially different from the topography of the land herein sought to be expropriated, as pictured by plaintiff’s own produced photographs. Nor did the aerial view of both properties, as shown on the exhibit ‘Defendant 15’ in the Reuter case, appear to show any difference as to the topography of the two properties.
“It is the Court’s opinion, and the Court finds as a fact, that the property is usable at this time, and that the highest and best use of the property is for use by industry that requires ship transportation, either for raw materials or for distribution of finished products, or both.
“If this were not a fact, why would the Dock Board wish to acquire the property? Actually, the highest and best use is that for which it is being expropriated, i. e., to extend the facilities of the Board of Commissioners of the Port of New Orleans to make it possible for more industries to locate in the area.
“Mr. Kuebel’s statement that there is a lack of utilities and inadequate levee protection does not seem to be borne out by the facts in this case. It has been shown that practically all utilities have been brought to the adjoining property (that now used by plaintiff herein), and even drainage would cease to be a problem if the properties herein sought to be expropriated are consolidated with that of the adjoining property of plaintiff.
“It does not take an expert of any character to advise this, or any other, Court as to that of which any Court can easily take judicial notice, i. e., that land values have steadily increased in every area of our country (and maybe the world) where the population growth has increased and the economic growth of the particular area has not been adversely affected by some catastrophe or other factor which may have had the effect of adversely affecting the increased growth of the area, such as the closing of some temporarily opened large facility.
“As a simple proof of this fact, in 1951 the plaintiff herein sold 8.59 acres of land on Old Gentilly Road bounded by the L. & N. Right of Way for 6 cents a square foot, and in 1955 — only four years later (see Frilot comparables Nos. 10 and 11)— the purchaser sold half of the property for 22 cents a square foot. On the same basis of increase in value this would make this property worth as much as, if not more, than the property which Mr. Kuebel appraised for $1.25 a square foot in the cases hereinabove referred to. The property is located about %oths of a mile west of the property herein sought to be expropriated.
“The Court further feels that it has the right to take judicial cognizance of the fact that during the adult life of most of those connected with the instant case, the area of the city of New Orleans east of the Industrial Canal has been converted from a low-lying swamp into an area in which millions and millions of dollars have been invested, in both residential and light and heavy industry. The draining and filling of land, heretofore referred to as swamp or marshland, has become a comparatively easy matter by the use of mechanical equipment which has come into general use within the past years, following the construction of the Industrial Canal.
“The Court further feels that it has the right to take judicial cognizance of the fact that where two pieces of property adjoining and abutting each other, whether these be large or small tracts of land, city *498 squares, or even lots, and one piece is developed through the investment hy the owner thereof of substantial sums of money, the effect on the adjoining and abutting unimproved land is to immediately increase the value thereof.
“The Court feels it would be impossible to contend that if two tracts of land adjoining each other had the same value as of a given date, that they would retain such value after one piece was substantially improved.
“The Court is therefore of the opinion that the very fact that the plaintiff has spent millions of dollars (one witness fixed the amount at $19,000,000.00) on the prop-perty which it has improved, and the fact that it has already acquired a large tract of land between its originally acquired property and the property herein sought to be expropriated on which it plans to expand its original operation, are factors which had a tendency to increase the value of the property now being sought to be expropriated.
“It therefore becomes incumbent upon the Court to fix a value on the land sought to be expropriated as of the date of taking, i. e., September 22, 1966. This is the sole question for the Court’s determination at this time.
“Plaintiff’s expert appraiser, Mr. Kuebel, has valued the property, as of the date of taking, at $0,149 (or about 15$) per square foot, or approximately $6500.00 an acre. He bases his appraisal entirely upon ‘com-parables’ which he has chosen. These com-parables consist largely of parcels, either expropriated from, or 1 purchased after negotiations with the owners (including some of the defendants) who owned property in the right of way of Almonaster Avenue Extension, and which the city acquired for the Right of Way for said avenue. The Court is of the firm opinion that these pieces of property do not properly form ‘comparables’ upon which the market value of the property sought to be expropriated can be fixed.
“The Court is of the opinion that the enhancement in value of the land owned by those who sold to the City of New Orleans, and which was cut through by the Al-monaster Avenue Extension project, would certainly have been adequate inducement for such owners to transfer that portion of their property needed for such right of way at a price below the actual value. It would not seem unreasonable, in the Court’s opinion, for the City of New Orleans to have asked that the owners donate such property.' (This procedure is often followed in other areas where roads and streets are felt to so enhance the value of adjoining property so as to make it profitable for a land owner to donate his property for a right of way for a road which will either run through or border along his property).
“However, if these particular comparables are used, then according to Mr. Keubel’s testimony and his report which is in evidence, 16 of the 26 sales were for approximately 200, 3 for 21(5, 2 at 250, 1 at 260, 1 at 270, 2 at 280, and 1 at 330, making an overall average of 220 a square foot. It must be noted that all of these sales took place in 1964, 1965 and 1966.
“The comparables which Mr. Kuebel used in order to arrive at the average per square foot value which he has placed on the property being expropriated are sales which— with the exception of one (Kuebel’s No. 33) took place in 1961 and 1963 (see Kuebel’s Nos. 26 through 34). The one sale in 1966 was for 31.650 a square foot.
“It is again difficult for the Court to reconcile Mr. Kuebel’s appraisal figure of 150 a square foot for the property herein sought to be expropriated with his testimony given herein and given in connection with other expropriation cases in which he testified as an expert for the land owners. In the instant case, while on cross examination, the following questions and answers are recorded:
“‘Question: (By Mr. Guillot). You recall making a statment in that case, I *499 quote: “The worse swamp property in the Gentilly area is worth at least 25(é ?
“ ‘Answer: (By Mr. Kuebel). I might have made that statement, yes.
“ ‘Question: The Mississippi-Gulf Outlet' — ■
“ ‘Answer: Would you let me see that? I want to see what we were talking about
“ ‘Question: Yes, I will.’
“In the Reuter case, heretofore referred to, Mr. Kuebel testified that that property had a value of $1.25 a square foot. In the Glaser case, also hereinbefore referred to, Mr. Kuebel testified that the property had a value of $1.15 a square foot, and in the Cenco, Inc. case, also referred to herein-above, Mr. Kuebel testified that the property had a value of $1.15 a square foot.
“As will appear from the appellate court’s decisions, ([State, thro Dept. of Highways v. Reuter] 175 So.2d 316, [State thro Dept. of Highways v. Cenco, Inc.] 187 So.2d 162, and [State, thro Dept. of Highways v. Glaser] 187 So.2d 452) affirming the prices fixed as set forth above, the fact that these properties were in the area in which the NASA facility, New Orleans East, and the Mississippi-Gulf Outlet or Ship Channel were located accounted for the value so fixed. It will also be noted that these appraisals were based upon values fixed as of dates two or more years prior to the date of taking of the property herein sought to be expropriated.
“Here again, the Court does not consider the property involved in the three above cited cases to be comparable to that herein being expropriated, but Mr. Kuebel’s testimony in those cases, when compared to that given in the instant case and contained in his report, compel the Court to question whether Mr. Kuebel’s appraisals are somewhat dependent upon whether he has been called as an expert for the expropriating authority or for the land owner.
“The Court is not unmindful of the rules of evidence and procedure which apparently permits an ‘expert’ not only to testify as to facts and as to his opinions based upon his ‘expert’ knowledge, but that he is also permitted to remain in the Courtroom (while lay witnesses are excluded); that he is further permitted to aid and assist counsel for the party or parties by whom he was employed, in their examination of other expert witnesses on the opposite side of the proceeding. Nevertheless, in this, as in other similar proceedings, this Court is of the opinion that the witnesses thus qualified as expert witnesses in the field of property appraisal actually become advocates. In short, it is the opinion of this Court that the matter of such expert appraisers’ testimony as to values — unless based upon TRUE camparables — becomes ‘suspect’ and still leaves the Court without any factual basis upon which to arrive at a just decision.
“It will be noted that except for the property designated as Mr. Kuebel’s No. 34, and Mr. Frilot’s No. 6, none of the properties used as comparables are located south of the Almonaster Avenue Extension or border along the Mississippi-Gulf Outlet. The only other exception may be that property which the plaintiff herein already expropriated from many landowners, in the matter of Board of Commissioners of the Port of New Orleans v. Home Builders Realty Company, Inc., No. 449-272 of the docket of this Court. In that case there were more than 100 defendants each of whom had purchased lots in a subdivision which had been formed out of the tract of land expropriated, and which is located between the land of plaintiff and the Best-wall Company and the land sought to be herein expropriated. It would therefore be difficult to use any of the values placed on the individual lots as a basis for fixing the square foot value of the property herein sotíght to be expropriated.
“Although the plaintiff originally acquired the tract of land upon which its present facilities are constructed not too *500 many years ago, and although it thereafter acquired the property immediately south of its facilities from the Whitney National Bank, no testimony has been offered by either side in these proceedings as to the price paid for any portion of any of this land. Nor has any testimony been offered as to the price paid for the land which is generally referred to as the Bestwall property.
“After carefully reviewing all of the evidence and the appraiser’s reports, it is this Court’s opinion that the only comparable which it can use in fixing the market value of the property herein sought to be expropriated as of date of taking is that property (hereinafter referred to as the ‘Aurora Property’) which, although some distance (about one mile) from the property herein sought to be expropriated, is, nevertheless, of the same type and character as to soil conditions and of the same general topography as that of the land herein sought to be expropriated. While it is true that the Aurora property is bordered on the East by Paris Road and on the North by Gentilly and Almonaster Avenue Extension, the property herein sought to be expropriated is also bordered on the North by the Almonaster Avenue extension and will ultimately be bordered on the East by Crow-der Road. While this latter road has not been constructed, and monies therefor have not actually been appropriated, there is little doubt that it will ultimately be completed, and consideration of this fact must be given in determining the values of this property as compared to the Aurora property as of the date of taking. At that time the condition of the Paris Avenue bridge over the Mississippi-Gulf Outlet was not as it is at the present time, and hence the value of Paris Road as of that date was not the asset it is as of today. The testimony and the evidence in this matter also shows that when the Aurora property was purchased the seller did not have, and therefore could not convey, title to the land which abutted upon the Mississippi-Gulf Outlet. Hence the property was approximately the same distance from the Mississippi-Gulf Outlet as is the property sought to be expropriated by the plaintiff herein. At a later date, through an exchange of property, title to the land abutting the Mississippi-Gulf Outlet was obtained by the present owners of the tract, but there is no evidence as to what consideration was paid for the land or for a relinquishment of any claim which others may have had to the land. The record shows that an exchange of property was made but what value the properties exchanged had has not been made a part of the record. Hence, the purchase price of 20<¡¡ and the sale price of 36f! did not include frontage on the Mississippi-Gulf Outlet, making the Aurora property even more of a comparable with the property herein sought to be expropriated.
“The Court is further of the opinion that in making a comparison of the two sites, the quantity of the land must be taken into consideration. The Aurora property contains 6,185,520 square feet, while the property owned by the defendants herein consists of a total of approximately 3,000,000 square feet, of which some 857,675.84 is sought to be expropriated. Whether or not a greater square foot value should be placed upon a smaller or a larger tract of land of the same type and kind in the same area is debatable. However, inasmuch as the testimony in the instant case is to the effect that the Aurora property is being developed into small tracts for industrial use, and the best use of the property sought to be expropriated is also said to be for that same purpose, it would appear that the fact that one tract was half the size of the other would not materially affect its square foot value. It may be noted that no testimony on this point has been offered by either party to this litigation, so once again no help is given the Court on this question.
“The Court is further of the opinion that as a larger tract is offered the number of prospects usually diminish, as there are more prospective buyers with smaller sums *501 and more facilities for borrowing smaller sums than for larger sums.
“The Aurora property was purchased by Mr. Jack Perry on February 19, 1963, for a price equal to $0.2075 per square foot or $9,037.50 per acre (See Kuebel’s comparable No. 34). In September of 1965 Mr. Perry sold the property to Aurora Properties, Inc. for a price equal to 360 a square foot or some $15,850.00 an acre (see Frilot comparable No. 6). It has been pointed out by defendant’s appraiser, Mr. Frilot, that this sale may not be considered an ‘arm’s length’ transaction, inasmuch as Mr. Jack Perry is the principal stockholder of the corporation to which the property was sold in 1965. Obviously, this factor does affect the question of whether or not the 36^ was a price for which a willing seller would sell and a willing buyer would buy. However, the Court feels again that it has a right to take judicial cognizance of the fact that in a transaction such as this one the seller is compelled to pay, (either at the time of the sale, or at a later date, if the sale was an exchange of land for stock) an income tax (even though probably a capital gains tax) on the difference between his purchase and sale price of the property. No testimony has been offered that would indicate that there would have been any advantage to the-seller in fixing a price for the sale of the property greater than its actual value at that time. On the contrary, a sale made for a sum less than the actual value might well have been questioned by the taxing authorities.
“It is also noted that the city of New Orleans paid some 70 a square foot more for the property purchased out of the Aurora tract for the Almonaster Avenue Extension in 1966 than it paid for other properties bought for the same purpose in 1964.
“There is, however, a distinct difference between the Aurora property and the property herein sought to be expropriated, which is advantageous to the property herein sought to be expropriated. That is the fact that adjoining the property sought to be expropriated is the ‘Public Bulk Terminal’ of the Port of New Orleans, which is advertised as being ‘Located on a new shortcut seaway between the harbor and the Gulf of Mexico, which is the most versatile facility of its type in this region, for handling a wide range of dry materials transported in bulk.’
“To make use of the facilities of the Mississippi Gulf Outlet for those who may locate within the Aurora property will certainly require the development of docks, wharves and other types of facilities which are already available to those who may have located on the property herein sought to be expropriated. Plaintiff’s Deputy Director of Port for Planning and Engineering (Colonel Lewis) has testified that the installation of one conveyor from the wharf on the river to a point within the property cost $775,000.00 or an average of $230.00 a lineal foot when erected prior to 1964. Hence, this one item would mean more than 100 a square foot spread over the 6,185,520 square feet of area of the Aurora property.
“As already stated herein, plaintiff’s appraiser has fixed the value of the land sought to be expropriated herein at $0,149 per square foot. Mr. Frilot, one of defendants’ appraisers, has fixed the value at 500 a square foot for all of the property except the Vincent tract, and he places a value of 600 a square foot on that property. Mr. Zollinger, another of defendants’ appraisers, has fixed the value of the land at 450 a square foot, with the Vincent property value fixed at 600 a square foot. And finally, Mr. Maloney, another appraiser produced by defendants, has placed a value of 530 a square foot on the property other than the Vincent property, and he has placed a value of 580 a square foot on the Vincent property.
“Having given careful consideration to all of the opinions of the appraisers, and having analyzed all factors and the testimony *502 and evidence produced during the four days of the trial of this matter, the Court is of the opinion that the market value of the property sought to be expropriated, exclusive of the Vincent tract, had a fair market value as of the date of taking of 410 a square foot. The Court is further of the opinion that the fact that the Vincent tract has frontage along the proposed Crowder Road would make that particular property of somewhat greater value than the other tracts being expropriated. What this difference should be is not easily determined. It will be noted that Mr. Kuebel does not differentiate this tract from the others, but for the reasons stated the Court is of the opinion that this position cannot be justified. The other appraisers have shown a difference in value of 50, 100 and 150. The Court is of the opinion that the difference should be 50, thus fixing the fair market value of the Vincent tract at 46^ a square foot.
“The basis for the Court’s finding is the value placed upon the Aurora property of 360 a square foot about a year prior to the date of taking of the property herein sought to be expropriated, and an added value of 50 a square foot which the Court feels would be the minimum that should be added because of the proximity of the plaintiff’s development adjoining the property herein sought to be expropriated which is not so available to the Aurora property, and the additional period of time of one year.
“In adding an additional 50 a square foot as the value of the Vincent property the Court must frankly admit that while he may contend — as do the expert appraisers that their values are what ‘in their judgment’ the price should be — the addition of this 50 is little more than a guess as to what additional value should be given this property because of its particular location abutting on the proposed Crowder Road. While the appraisers give figures on this they do not substantiate it with anything authoritatively on which their judgment may be based.
“ ‘Judgment’ has been defined by dictionaries to be ‘The ability to make a decision or form an opinion objectively, authoritatively and wisely — good sense — discretion.’ While ‘Guess’ has been defined as ‘To estimate or conjecture about correctly’; ‘To think, believe or suppose’; ‘To form an estimate.’
“Therefore, there is little difference between the appraisers’ figures which are arrived at as being the proper figure ‘In their judgment’ and the Court’s figure which is somewhat of a guess, since there is no comparable figure to be used and no authoritative basis for the determination of the correct figure which should be added in arriving at the increased value of the Vincent property.
“The final matter for determination by the Court is whether or not the defendants are entitled to ‘severance damages’ by reason of the fact that only a portion of their properties is being expropriated.
“As previously set forth, all of the defendants’ property will front on Almonas-ter Avenue, now that that Avenue has been extended so as to cut through the defendants’ properties. Therefore, the property which they retain after plaintiff has expropriated a portion of their property will have easy access to this Avenue, and that portion of their property which they will retain and which lies south of the Al-monaster Avenue Extension will be ample in size to accommodate such industries as it is anticipated will locate in the area. The only possible claim which the defendants could have for severance damages would be the fact that whereas the southern boundary of their properties was located some 500 feet from the water of the Mississippi-Gulf Outlet, the southern boundary of their property will now be some 1400 feet from the water.
“The evidence shows, however, that without the acquisition of the property sought to be expropriated the southern boundary of defendants’ property would be 300 or more feet from the equipment, *503 conveyors, etc., which would he used by the type of industry most likely to locate on the property, while after plaintiff has acquired the property sought to be expropriated herein and’ develops it as it is planned they will do, the conveyors and similar equipment will actually be not more than 280 feet from the southern boundary of the remaining property of the defendants.
“Furthermore, it has been testified that the best use both of the property being expropriated and of the remaining property would be to consolidate the tracts of land. If this would be done, then all of the tracts would have access to Crowder Road when completed, and this would give all of the tracts direct connection to the water’s edge of the Mississippi-Gulf Outlet.
“Under these facts and circumstances, the Court is of the opinion that defendants are not entitled to any severance damages.
“In view of the holding of the Appellate Court in the cases of State of Louisiana through the Sabine River Authority vs. Miller, 184 So.2d 780, State of Louisiana through the Sabine River Authority vs. Salter, 184 So.2d 783, Orleans Parish School Board vs. Bond, 200 So.2d 411, the Judgments rendered herein will include legal interest from judicial demand.”
Counsel for plaintiff have criticized the allowance of legal interest from date of judicial demand and the citations of the cases supporting that allowance at the end of the trial court’s reasons above. We have reviewed some of the decisions on the allowance of interest on awards in such situations and we believe that the trial court was led into error by the fact that the allowance of interest, if any, on expropriation awards and the date from which it runs has been a little mixed up or misunderstood. In the two cases, State through Sabine River Authority v. Miller, La.App., 184 So.2d 780, and State through Sabine River Authority v. Salter, La.App., 184 So.2d 783, interest was allowed from the judicial demand. In the latter case the Third Circuit Court of Appeal referred to Gravity Drainage District No. 1 v. Key, 234 La. 201, 99 So.2d 82, in which the Supreme Court had allowed interest from judicial demand and the Salter decision said that “the Gravity Drainage District case is the last expression of our Supreme Court on the question and is controlling here.”
Then came the case of State through Sabine River Authority v. Miller, 250 La. 668, 198 So.2d 397, in which the Third Circuit Court of Appeal again allowed interest from judicial demand. The Supreme Court granted limited certiorari and reversed the judgment in that particular only. The effect of that decision is that in this type of suit there is no debt due until judgment is rendered conveying title to property to the expropriating authority. Interest runs only from the time the debt is due and payable. There is no debt in expropriation cases under the general law until judgment is rendered granting the expropriation of property. Even after judgment is rendered transferring title to the property, the expropriating authority cannot take possession until it either pays the amount of the judgment to the defendant or deposits the amount to defendant’s account in the registry of the court. In the Ross Miller case, supra, decided May 1, 1967, the plaintiff had deposited the amount of the judgment in the registry of the court, leaving no amount unpaid and, of course, there was no interest due because there was no debt. That was the reason the Supreme Court allowed no interest.
On June 5, 1967, this court handed down its opinion in Orleans Parish School Board v. Bond, 200 So.2d 411, awarding interest from judicial demand, following prior decisions up to the Ross Miller decision on May 1, 1967. Evidently, the Supreme Court case of Ross Miller, supra, had not been published when the Court of Appeal decision in the Bond case was rendered. Since that time the cases entitled Gulf States Utilities Company v. Ponder, La. *504 App., 204 So.2d 109, and Recreation and Park Commission for Parish of East Baton Rouge v. German, La.App., 202 So.2d 469, have awarded interest from the date of judgment.
For these reasons the judgment appealed from is amended by eliminating therefrom the words: “of judicial demand,” and inserting in lieu thereof the words: “of April 18, 1968, the date the judgment was rendered and signed,” in all other respects the judgment appealed from is affirmed, the plaintiff to pay all costs.
Amended and affirmed.